## NEWCOMB v. STATE, 37 Miss. R., 383.

### HOMICIDE.

Art. 7, p. 573, of the Rev. Code, which provides that all objections either to the form or substance of an indictment shall be made before verdict, applies to those cases only where the defect is of such character that the accused may waive it, either expressly or by his silence.

The right secured to the accused by the 10th section of article 1 of the constitution of this state, " to demand the nature and cause of the accusation against him," cannot be waived or surrendered by him; and hence, if the indictment do not contain such a description of the offense as to give him the nature and cause of the accusation against him, it is a nullity, and may be objected to at any time.

The means and manner of the commission of the crime of murder are not necessarily embraced in a description of the "nature and cause of the accusation," in the sense of the constitution of this state; and hence article 256, p. 616, of the Rev. Code (which provides that "in an indictment for homicide, it will not be necessary to set forth the manner in which, or the means by which, the death of the accused was caused; but it shall be sufficient to charge in an indictment for murder that the defendant did feloniously, wilfully, and of his malice aforethought, kill and murder the deceased"), is not in conflict with the 10th section of the bill of rights, and an indictment framed under it is valid.

In order to render declarations competent evidence in favor of the declarant, on the ground that they are part of the *res gestæ*, it is essential that they should have been made contemporaneously with the main fact which they are offered to illustrate, and whilst the transaction they are supposed to explain was being carried on; and hence the declarations of a party accused of murder, made just before the killing, and while the deceased was absent, and when the accused did not suspect that a conflict with the deceased was impending, is inadmissible in his favor.

Where it does not appear from the evidence that the deceased made any hostile demonstration against the accused at the time of the killing, nor even that the threats which he had previously made against the accused were known to the accused, the latter has no reason to believe that the feelings of hostility which caused the deceased to assault and beat him on a previous occasion still continued, or that there was danger of a deadly assault upon him by the deceased at the time of the killing.

If a witness answer in the affirmative a question whether he has not made statements or done acts in relation to the matter involved in the issue, going to show a strong feeling or bias on his part, touching the main fact which gave rise to the trial, and in justification or condemnation of the party on trial, that fact would be proper to be weighed by the jury in considering the weight to be given to his testimony.

It is competent to contradict the testimony of a witness, who, upon his examination, has denied that he had used expressions or done acts, in relation to the matter involved in the issue, showing that he is under a bias or undue influence against the opposite party involved in the transaction which forms the subject-matter of the issue.

Anything legitimately tending to show that a witness is under undue influence or bias

for or against a party to an issue in which he testifies, may be shown to a jury, to ena-
ble them to graduate the true value or his testimony ; as, the near relation of the witness
to the accused.

A party introducing a witness has no right to object to the propounding of a ques-
tion to the witness, the answer to which might tend to criminate him. It is in the
power of the witness to object, and if he does not object, the question and answer, if
not otherwise objectionable, are competent.

If a witness declines to answer a question on the ground that the answer might crimi-
nate him, no inference prejudicial to his credit can be drawn from his refusal, and
courts should be careful so to inform the jury.

If it be established by the legal evidence that the accused committed a criminal
offense, it will be presumed that it was done by a sound mind; and that presumption is
not overcome by the probability that the accused is insane. In order to establish a de-
fense on the plea of insanity, it must be clearly proved.

The jury are the judges of the evidence. Therefore it is no ground of reversal that
the jury did not give credit to certain witnesses.

A new trial will not be granted to allow a party to introduce new evidence, which is
merely cumulative, and which it does not appear was unknown to him before, and
could not have been procured by him at the trial.

The courts may disregard the statements made in *ex parte* affidavits read in support
of a motion for a new trial, where such statements are highly improbable, and inconsis-
tent with the state of facts appearing on the trial.

A special *venire* is no part of the record in a criminal case, and cannot be made so un-
less it is embodied in the bill of exceptions.

Error to Tishomingo circuit court. ACKER, J.

Tyra G. Newcomb was indicted in the court below for the
murder of John Frieze. The indictment charges "that Tyra G.
Newcomb, late of said county, laborer, on the 16th day of July,
in the year of our Lord one thousand eight hundred and fifty-
eight, in the county of Tishomingo aforesaid, did feloniously,
wilfully, and of his malice aforethought, kill and murder John
Frieze, against the form of the statute in such cases made and
provided, and against the peace and dignity of the state of Mis-
sissippi."

The defendant was arraigned, and plead not guilty.

William Freize, a brother of deceased, testified that the
deceased was shot by the prisoner, and died on the 11th day of
July, 1858, in Tishomingo county ; that in the forenoon of that
day, deceased and witness were engaged in cutting timber on a
ridge in the woods, and while thus engaged, the prisoner came
to them from a hollow, where witness had heard a gun fired.
The prisoner had a rifle and a squirrel, which he had shot; and
when he first came up and inquired of witness if he had seen
certain hogs, which he described, and said he was hunting for
them, witness replied that he had not seen the hogs, and then
he and the prisoner conversed a little about the hot weather for

cutting stocks, and other matters. After a short time, witness told the prisoner he had seen hogs in the bottom near by, and suggested that probably they might be the hogs prisoner was looking for. The prisoner then asked where they got water to drink, and witness informed him where the spring was. Defendant then went into the bottom and called the hogs; and soon afterwards, without going to the spring, he returned and said the hogs were not his. Witness and the prisoner talked together again, and the prisoner remained with them some time. While he was there, it happened that witness and the deceased were both cutting on the same log with their backs turned to the prisoner; and the witness, turning his head, saw the prisoner make two steps towards a small tree, and he appeared to see that witness was looking at him, and "grunted out something" which witness did not understand. Soon afterwards the prisoner inquired after the wagon, engaged in hauling stocks, and left, passing over the ridge. Witness and deceased continued cutting timber until dinner time, when witness started over the ridge to tell the negroes cutting timber that it was dinner time, and the deceased started in the direction of the mill, agreeing to wait in the road until witness should overtake him. When witness got in sight of the road, he saw the wagon and team, under the charge of David Brown, standing in the road, and headed towards the mill. The wagon was loaded with three logs, two at the bottom, and one on the top of these. The deceased was sitting on the top log, and was facing to the left side of the wagon. Brown was sitting down just in front of the deceased, and so near to him, that upon rising he could have put his hands upon him. The defendant was sitting to the right of Brown, and nearest to the rear of the wagon, and a negro was sitting still farther to the right, and in the rear of Brown and the prisoner. Witness continued to approach, and heard the firing of a gun, and saw the smoke rise from the prisoner's gun. The deceased put his right hand to his left breast, and said, "Lord of mercy!" Brown then rose up and put his hand to the deceased to support him. "At the firing of the gun witness saw the prisoner rising up and running off from the place, and after running some ten steps he stopped, turned, and seemed to

be looking the deceased in the face; and at that instant the deceased bowed his head, and the prisoner ran on.

Brown then hallooed to witness to come on, and witness ran in the direction of the wagon, which brought him to crossing the line of the defendant's flight, and they approached near together. The prisoner drew a pistol and said to witness, "If you come here, I will serve you in the same way." This occurred about fifty yards from the wagon. Witness then ran to the wagon, and the accused ran off, taking the road which leads to his father's house. Witness assisted Brown in taking deceased from the wagon, and immediately after this the deceased died. The bullet entered the body of the deceased an inch or two above the left nipple, and ranged to the right side of the back part of the neck, where the shoulders join.

On cross-examination, witness stated that while the prisoner was with him that morning in the woods, he appeared perfectly friendly and agreeable, and conversed as usual, in a friendly manner. Nothing unusual occurred which at the time attracted the attention of witness. Witness and the prisoner were perfectly friendly. Witness could not say whether the step or two taken by the prisoner was for the purpose of getting into the shade or not, and it did not excite his attention "immediately at the time." No words were exchanged by the accused and the deceased in the morning. The prisoner could have shot the deceased while they were cutting stocks, if he had desired to have done so. Witness did not hear Brown tell the prisoner after the shooting to stop, nor ask him what he had been doing there. Witness was more than fifty yards from the wagon when deceased said, "Lord of mercy."

About fifty yards from where the wagon stood, and in front of it, the road intersected with another leading from prisoner's father's house. These roads approached each other so as to form an acute angle; and so that a point on the Newcomb road, fifty yards from the intersection, would not be over fifty yards from the place where the wagon stood. This road was on the left of the wagon. The shooting took place about one quarter of a mile from Newcomb's house. Witness did not probe the wound, nor see it probed; thought it ranged as he

had stated, because he saw that blood had settled on the back of the neck, where the right shoulder joins it. The ball did not pass out of the body.

David Brown, for the state, testified that a short time before the killing, the prisoner, having a rifle and a squirrel, came to where witness was loading stocks on his wagon; he set his gun down and assisted witness in loading. After the stocks were loaded, witness sat down on the left of the wagon, and facing it. The prisoner picked up his gun and sat down a few steps to the right of witness, and also facing the wagon; and a negro sat down still farther to the right, and more in the rear. In a short time the deceased came up, and said he wanted to ride; and by permission of witness, he got up on the wagon. The position of deceased on the wagon was described by Brown, as witness Freize had testified. Deceased then had some conversation with the negro about the negroes whipping his teams, and then the deceased turned his face fully to the team and whistled, for the purpose of starting it. The two front pair of oxen had started, but the others were still standing; and the witness was just in the act of rising up to tell the prisoner good-bye, when he saw the prisoner with his rifle bearing on the deceased, the breach of it being on his breast or near his shoulder, and he immediately fired. The deceased put his hand to his breast, and said, "Lord of mercy!" The blood gushed from his mouth and nose, and he was about to fall, when witness caught hold of him. When the gun fired, the prisoner ran off in the direction that William Frieze was coming, who was then approaching the wagon. Witness and the negro and William Frieze then assisted deceased from the wagon, when he immediately expired. Witness and the prisoner were engaged in a conversation about cutting stocks, when the deceased came up.

Cross-examined.—Witness stated that he and the prisoner were perfectly friendly, and they talked together in a perfectly friendly manner. After the gun fired, witness "called to William Frieze to catch or arrest the prisoner, for he had shot deceased." Frieze ran towards the prisoner in the Newcomb road, and told him to stop, and asked him "what he had been doing there." Prisoner then drew a pistol, and said,

"If you don't let me alone," or "mind your own business, I will serve you in the same way." This occurred some fifty yards from the wagon. Deceased spoke the words, "Lord of mercy," before referred to, in a very low tone of voice.

The prisoner's counsel then asked the witness to state what was said by the prisoner about the deceased while they were at the wagon, and before deceased came up; and the answer thereto was excluded from the jury, as stated in the opinion of the court.

The witness, on being asked if he had not told Daniel Carpenter on the day of the killing, "that he did not see the gun of the prisoner fired," denied having made such a statement.

Daniel Carpenter, for the state, testified that on the day of the killing, the witness Brown stated to him and others assembled at the place where it happened, in answer to the question, "How it was done," that he was just picking up his whip, with his back to the defendant, as the gun fired.

Mrs. Newcomb, the mother of the prisoner, testified that on the morning of the killing the prisoner left home for the purpose of hunting his hogs. After early dinner, the witness started to go to a neighbor's house; and as she approached a road leading to the mill, she heard loud talking, as if some persons were quarreling; "but still, she thought she would go on;" and having advanced a short distance further, she recognized the prisoner's voice. She was then alarmed no longer, and walked on to within a short distance of the point of intersection of the two roads, and stopped by a log in an open space, where she could see and hear distinctly what passed. The witness described the location of the wagon, and Brown, prisoner, and negro, in the same manner as Brown did. She stated further that the parties were not quarreling, "talking something about cutting stocks, or that had occurred at the mill—the matter not distinctly recollected." Witness supposed she was about twenty paces from the parties. Presently the deceased came up the road from the rear of the wagon, and went on the opposite side of it from where Brown and the prisoner were sitting, and said he wanted to ride. Brown told

him to get on the wagon, which he did; and shortly after-
wards he turned to the prisoner and said, "Tyra, what did
you intend to make of me at court?" The prisoner replied,
"Shut your mouth, John Frieze; I didn't come here to have
a fuss with you, and I don't want one." Deceased turned to
the prisoner and said, "Whether you want one or not, you
shall have one, and that is not all;" and as he spoke, he put
his right hand to his pantaloon's pocket, and looked like spring-
ing towards the prisoner. Brown rose up and said, "Now is
your time;" and the witness, thinking there would be a fuss,
started to go back to the house for her husband; and when
she had gone a few paces, she heard a gun or pistol fire, and
she then ran home to get her husband to come there. She
found her husband in the field, and told him what had oc-
curred; and he said Tyra was killed. When she and her hus-
band got to the house from the field, they found the prison-
er's gun loaded. They then concluded he was not killed.
They then started to the scene of the shooting, and met Tur-
ner Pinkston, who informed them that the prisoner had killed
John Frieze. They asked how he did it; and she said to
Pinkston, "If he had done it, she didn't blame him; she would
have done it too."

Cross-examined.—Witness told but one person (J. McCul-
lough) besides her husband, what she had seen, until she told
prisoner's counsel, after the last March term of the court. She
was present when the prisoner was tried before the justice of
the peace, in August, 1858. She had not communicated what
she knew because she did not know that a mother could be a
witness for her son. She had talked with two female acquaint-
ances in reference to her right to testify for her son. As soon
as she learned from prisoner's counsel that she was a compe-
tent witness, she communicated her testimony to them. Wit-
ness did not turn her head or look back when she heard the
gun fire. She was then asked in relation to a statement made
at the wheat harvest of 1858, to J. Lambert, as stated in the
opinion of the court.

She also testified that the wound on the defendant's head,
occasioned by the assault made on him by the deceased at the

mill, affected his health so much that he could not work. From the wound was discharged "much watery and bloody matter;" and that it had not cured up, but was still "running" at the time of the killing. Prisoner was much changed by the wound; in conversation he frequently wandered from the subject, and introduced new and strange ones.

The prisoner then introduced F. M. Hardwick, who testified that the deceased told him "he had not killed the prisoner, but he would if he ever crossed his path or fooled with him." Witness stated that he had never communicated this to the prisoner; and thereupon, on the motion of the district attorney, this testimony was excluded from the jury, and the prisoner excepted.

The prisoner then proved by ten witnesses, one of whom was J. Lambert, an uncle of the deceased, who were well acquainted with him and the deceased, that the character of the prisoner was good; that he was peaceable and industrious; and that the deceased was a turbulent, violent, and overbearing man. Several of the witnesses who were examined as to the condition of the prisoner's mind after the assault made on him at the mill by the deceased, and of these Dr. Carpenter, testified that after the said assault, and before the killing, the prisoner was frequently at witness' house, and he saw him also at other places; that in a conversation at witness' house, the prisoner abruptly changed the subject of conversation, and witness called his attention back to it again; shortly after, the prisoner again changed the conversation abruptly, and the witness a second time called him back to it. Prisoner then said "that before he received the *lick* from the deceased, he had a *misery* in the back part of his head; and since the *lick*, the *misery* from that in front had united with the *misery* behind, and made it very hard for him to control himself." At another time witness asked him "how his crop looked;" and he threw his head back and laughed, and said that "he had not made any." "He appeared different after the *lick* from what he was before, when he was uniformly an industrious, agreeable, and sensible young man."

L. Patrick testified, that before the assault by the deceased on the defendant, the latter was a sober, industrious, peaceable, and prudent young man; afterwards, he strolled about through

the woods, and was greatly changed from what he was before. This witness met the prisoner frequently after he was assaulted, and before the killing, and he usually had his gun; on one of these occasions the prisoner "flirted about his gun in such a strange manner as to alarm witness." The prisoner talked incoherently, leaving one subject and quickly passing to another.

John Little testified, that after prisoner was assaulted by the deceased, and before the killing, witness met the prisoner frequently; "there was a change in him; in conversation he was changeable, and would change from subject to subject frequently, and would repeat the same questions as if they had never been asked." His health was bad, and the wound inflicted by the deceased was not cured, but still "running" at the time of the killing.

J. Lambert was then introduced by the state, to contradict Mrs. Newcomb, in reference to her statements at the wheat harvest of 1858, who testified as stated in the opinion of the court.

At the instance of the state, the court instructed the jury on the subject of insanity, as follows:

6. That mere weakness of intellect, or imbecility of mind, does not excuse or exonerate a party from criminal punishment, if he had capacity and reason sufficient to enable him to distinguish between right and wrong, as to the particular act he was doing.

7. The law presumes every person, of the age of discretion, to be of sufficient capacity to form a criminal purpose; to deliberate and premeditate upon acts which malice, anger, hatred, revenge, or other evil disposition might impel to perpetrate; and to defeat this legal presumption, the mental alienation relied upon must be affirmatively established by positive or circumstantial evidence.

8. It is not sufficient to show that such a state of mind was probable, nor is it sufficient if the proof merely shows it to have been probable.

9. Partial insanity is not sufficient to excuse a party from criminal punishment, if he have reason and understanding

sufficient to enable him to distinguish between right and wrong in relation to the act.

10. Insanity, to amount to a complete bar of punishment, at the time of committing the offense, must have been of such a kind as entirely to deprive the prisoner of the use of reason, as applied to the act in question, and the knowledge that he was doing wrong in committing it.

The jury returned a verdict of guilty, and the defendant moved for a new trial, on the grounds that the action of the court on all the points to which he had taken exception during the progress of the trial, was erroneous, and also that the prisoner was really insane at the time of the trial; and in support of the motion, he read the affidavits of Dr. Walker and the jailor.

Dr. Walker's affidavit stated, that since the trial and conviction of the prisoner, he, assisted by two other physicians, had examined the prisoner, "and pronounced him to be partially, if not wholly imbecile, which is weakness and feebleness, and totally destitute of the power of reasoning."

The jailor's affidavit stated, that he had been in charge of the prisoner since January last; that when he first took charge of him the prisoner's health was bad, and has so continued most of the time since; that his health is now better; that during all this time the prisoner has exhibited an imbecility of mind, more that of a good-natured child than an adult; he has always been most obedient and docile, never complaining or making any objection to any arrangements made for him. On some occasions he has desired affiant to go into his room and play corns or buttons with him. At the last term of the court, when a quarter of a dollar was given him to buy cheese with, and for which article of food he had expressed a great desire, he said that the money was so pretty that he could not spend it, but that he would keep it; after a while he said it had become dirty, and that he had put it into his mouth to wash it off, and it accidentally passed down his throat. At two or more times, while affiant was assessing taxes, and had to be absent from home, the prisoner requested him to remain at home, stating that while he was absent he had heard persons

come into the room below and talk about chaining him, and also of whipping him, and that he could hear the clank of the chains. This was all untrue, as witness was informed by his family, who remained on the post when he was absent. The appearance of the prisoner was the same at these times as at all other times, but he must have been laboring under hallucinations of mind.

These things were not communicated to defendant's counsel until after the verdict, as affiant did not know what defense they would rely on. When affiant was taking the prisoner to jail, after the verdict was rendered, he manifested entire ignorance of its effect; and when he was informed on this subject, it did not, so far as affiant could discover, have any effect on him, he speaking of it with the same look of cheerfulness and composure which has been uniform with him since he was placed under affiant's charge. When he was told that he would be hung if the verdict was not set aside, his reply was, "that he supposed that it could not be helped," as composedly as if he was talking on any other subject, or the most indifferent subject. He was asked by the physicians who examined him, if he did fear punishment hereafter for killing Frieze, and he replied that he did not think he would be punished. Affiant's opinion was, "that the prisoner's mind was incapable of distinguishing right from wrong of itself, but that his ideas of right and wrong were altogether derived from others, or was traditional, and, as a matter of course, without the power to investigate for a conclusion for himself." Affiant could not observe that the trial, its progress or result, produced any effect at all on defendant's mind, feelings, appetite or temper, or, in a word, that it had any effect on him whatever. Affiant was firmly of the conviction that the prisoner was insensible of the consequences of the trial he had gone through, until he was told; or that his conviction was for the commission of a high offense against the laws, and that the penalty of the law was a just retribution therefor, as he was manifestly insensible of having committed any wrong, and he could not perceive the justice of the punishment pending, but in all that, will be as clay in the hands of the potter, so to speak, and will consent to

anything, or suffer anything, because he would be told to do so, and not because he had any just conception of its design, purpose, or effect.

The court overruled the motion for a new trial, and sentenced the prisoner to death ; whereupon he filed his bill of exceptions, and brings his case to this court.

The special *venire facias* is copied into the record by the clerk, but is not contained in or referred to by any bill of exceptions.

*B. N. Kinyon,* for plaintiff in error.

1. The indictment is insufficient. It does not inform the accused of the nature and cause of the accusation against him. Archb. Cr. Pl., 38 ; Riggs v. State, 26 Miss., 51 ; Murphy v. State, 24 Miss., 590 ; Norris v. State, 33 ib., 373.

2. The exclusion of the question and answer of witness Brown was error. The testimony was part of the *res gestæ,* and should have been admitted. Mitchurn v. State, 11 Ga., 615 ; 5 ib., 132, 85 ; Wray, *ex parte,* 30 Miss., 675.

3. Proof of threats by the deceased should have been admitted, although they were not communicated to the accused. Granger's case, 5 Yerger, 459 ; Cotton v. State, 31 Miss., 504.

4. The question propounded on cross-examination to Mrs. Newcomb was improper. Roscoe's Cr. Ev., 153–169–170 ; 1 Greenl. Ev., 462.

5. The eighth instruction for the jury was clearly wrong. 1 Lead. Cr. Cases, 552 ; State v. Moole, 2 Ala., 49 ; Algheri v. State, 25 Miss., 584 ; Lambert's case, 23 ib., 322 ; Browning's case, 30 ib., 672.

*T. J. Wharton,* attorney general.

1. It is too late now to object to the indictment. Rev. Code, 573, art. 7.

2. The answer of witness Brown was properly excluded. It was not part of the *res gestæ.* Gardner v. People, 3 Scam., 90 ; 34 Miss., 275 ; 1 Greenl. Ev., § 108 ; 3 Conn., 250 ; 11 Georgia, 622 ; State v. Tilly, 1 Iredell's L. R., 435 ; Wharton's Amer. Cr. Law, 173 ; 6 Metc., 221.

3. The testimony in relation to the transaction at the mill, and the threats there made, was properly excluded. Price's case, 36 Miss., 531; 4 Iredell's Law, 409; 3 Stew. & Port., 316.

4. The action of the court in relation to the questions propounded to Mrs. Newcomb on cross-examination was correct. 1 Burr's trial, 244; 1 Greenl. Ev., § 451; 4 N. H., 562; 1 Mer., 400; 1 Greenl. Ev., §§ 456, 459; 1 Stark. Ev., 197.

5. As to pretence of insanity set up, *vide* Bovard's case, 30 Miss., 600; State v. Rogers, 7 Metc., 500; 3 Kelly, 310, 326, 330, 331, 332; 2 Greenl. Ev., §§ 372, 373.

6. The eighth charge given for the state is correct. The *onus* of proving insanity is on the prisoner. State v. Starke, 1 Strob., 479; Regina v. Taylor, 4 Cox's C. C., 155; 4 Cow., 207; 5 J. R., 144; 1 Curtis, 1; 1 Peters' C. C. R., 163; 1 Parker's C. C., 495, 649; State v. Spencer, 1 Zabriskie, 202.

HANDY, J. :

The plaintiff in error was indicted and convicted, in the court below, of the murder of John Frieze.

Exceptions were taken upon the trial to various rulings of the court against the accused; and after the verdict of conviction, a motion was made by him for a new trial, upon many grounds; which motion having been overruled, a bill of exceptions thereto was taken, and the case is brought here by writ of error.

Numerous errors were assigned, founded both upon the rulings in the court below, and upon other objections taken to the record. The questions thus raised we will proceed to consider.

The first error assigned is, that the indictment is insufficient in substance to support the conviction.

The indictment charges " that Tyra G. Newcomb, late of said county, laborer, on the 16th day of July, in the year of our Lord one thousand eight hundred and fifty-eight, in the county of Tishomingo aforesaid, did feloniously, wilfully, and of his malice aforethought, kill and murder John Frieze, against the form of the statute in such case made and provided, and against the peace and dignity of the state," &c. It is framed upon the

provisions of article 265 of the Revised Code, 616, that " in an indictment for homicide, it shall not be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but that it shall be sufficient to charge, in an indictment for murder, that the defendant did feloniously, wilfully, and of malice aforethought, kill and murder the deceased.

It is not denied that the indictment is in conformity to these provisions, but it is insisted that the provisions are inconsistent with the 10th section of article 1 of the constitution of this state, which secures to a party accused by criminal prosecution the right " to demand the nature and cause of the accusation." It is, however, objected, in behalf of the state, that the alleged error cannot be considered here, inasmuch as no objection to the indictment was taken in the court below, and that the party is precluded from raising it here by the provisions of art. 7 of the Code, 573. If the error here assigned were upon matter of form, or even upon such matter of substance as the accused might waive, either expressly, or by failure to take advantage of it at the proper time and in the proper mode, in the court below, the objection to entertaining it here would prevail under the rule declared by the statute. But the error insisted upon goes to the very essence of the offense. It is that the indictment is invalid, because, in law, it charges no offense against the accused. If this position be correct, it is manifest that he could not waive the insufficiency of the indictment, by neglecting to raise any objection to it in the court below, so as to render a conviction rendered upon it valid; for that would be, by mere silence, to give legal validity to a criminal charge against him, when the indictment contained no such legal charge. On the contrary, the concluding clause of the article of the statute referred to plainly shows that it was deemed necessary that " the offense should be substantially described " in the indictment, and that a defect in that respect was not intended to be embraced in the provisions of the statute.

Is the statute, then, authorizing this indictment, in violation of the right of the accused to be informed of " the nature and cause " of the accusation against him? We think not. He is

charged in the indictment with *murder*, wilfully, feloniously, and of malice aforethought. This shows the "nature" of the accusation. The means by which the act was committed do not pertain to the "nature" of the accusation, nor are they properly the "cause" of the charge. When he is charged with *murdering John Frieze*, both the nature and cause of the accusation brought against him are made known to him sufficiently to enable him to know the particular offense with which he is charged, and to prepare to show his innocence, his excuse, or justification. The offense is particularized, so that if he should be acquitted, he will be enabled to plead the acquittal in bar of a subsequent indictment for the same offense: for, from the nature of the charge, the offense could be committed but the once; and if he was once acquitted upon the general charge of murdering John Frieze, upon settled principles, that would be an ample defense to any subsequent charge for the murder of him, however made, or upon whatever evidence it might be attempted to be sustained.

We do not, therefore, think that the means, mode, or circumstances of the commission of the crime of murder are necessarily embraced in "the nature and cause of the accusation," in the sense of the constitution, and of which the accused has the right to demand information in the indictment. They are rather matters of evidence to establish the charge. The forms of proceeding in which these particulars were observed have been established by long usage; but, for the most part, they are but modes of proceeding which the legislature has the undoubted power to change or modify. That power they have thought fit to exercise in the enactment of the statute under consideration, and we are satisfied that it does not infringe any substantial right intended to be secured to the accused by the constitution. This ground of error is, therefore, not tenable.

The second error assigned is the exclusion of certain declarations of the accused, brought out upon cross-examination of the state's witness, Brown, which were, in substance, that shortly before the killing took place, and while the witness and the accused were sitting at the place where it occurred, and before the deceased came to the place, the accused said to Brown, that he

had been told by others that if they were in his place, and had been treated by the deceased as the accused had been, they would kill Frieze; but that he had no harm against him, and would not hurt a hair of his head; and this was just before the deceased came up to the place where he was shortly afterwards shot by the accused.

These declarations, it is contended, were part of the *res gestæ*, and should, therefore, have been admitted in evidence in behalf of the accused.

It appears that they were made in the absence of the deceased, and when, according to the positions taken in the defense, the accused did not suspect that the scene which shortly afterwards occurred would take place. They were, therefore, neither part of, or directly connected with, the killing, but were mere independent statements of the party in regard to his then state of mind towards the deceased. In order to render declarations evidence in behalf of the party making them, they must be made contemporaneously with the main fact which they are offered to illustrate, and while the transaction which is proposed to be explained or characterized.[1] Holman v. Murdock, 34 Miss., 286; Meek et al. v. Perry, at October Term, 1858, not yet reported. When so made, they become facts, which are identified with the transaction, and are proper to be considered in determining its true character. But when made before the transaction between the parties is entered upon, they are the mere declarations of the party making them, and are not admissible in evidence in his behalf. To admit such declarations in evidence in his behalf would be to allow a party to make evi-

[1] 1 Greenl. Ev., 108; Enos v. Tuttle, 3 Conn. R., 250; Russ. on Cr., 750; Rawson v. Haigh, 2 Bing., 104; Ridley v. Gyde, 9 ib., 349, 352; Pool v. Bridges, 4 Pick., 379; Allen v. Duncan, 11 Pick., 309; Haynes v. Rutter, 24 Pick., 242; Gray v. Goodrich, 7 Johns., 95; Bank of Woodstock v. Clark, 25 Vermont, 308; Mitchem v. State, 11 Georgia, 615; Tomkies v. Reynolds, 15 Ala., 109; Cornelius v. State, 7 Eng., 382; and see *In re* Taylor, 9 Paige, 611; Carter v. Buchanan, 3 Kelly, 513; Blood v. Rideout, 13 Met., 237; Boyden v. Burke, 14 How. S. C. R., 575; Fanner v. Turner, Clarke (Iowa), 533; Elkins v. Hamilton, 20 Vermont, 627; Noyes v. Ward, 19 Conn., 250; Corinth v. Lincoln, 34 Maine, 310; Story on Bailments, § 339; citing Tompkins v. Saltmarsh, 14 S. & R., 275; Beardslee v. Richardson, 11 Wend., 25; Doorman v. Jenkins, 2 Ad. & Eld., 80; Hadley v. Carter, 8 N. H., 40; Lund v. Tyngsborough, 9 Cush., 36. Upon any inquiry as to the state of mind, sentiments, or dispositions of a person at any particular period, his declarations and conversations are admissible. They are part of the *res gestæ*, 1 Greenl. Ev., 108; Barthelemy v. People, 2 Hill (N. Y.), 248, 257; Wetmore v. Mell, 1 Ohio (N. S.) R., 26; 1 Greenl. Ev., 102; Nutting v. Page, 4 Gray, 584.

dence for himself, and, if believed, to disprove the imputation of malice, clearly apparent from the circumstances. This would be against all principle, and productive of great evil. Such is the character of the declarations in question, and the court properly excluded them.

The third assignment of error relates to the exclusion of the testimony offered in behalf of the accused, and set forth in the second bill of exceptions. This testimony was, in substance, that about six weeks or two months before the killing, the deceased had commenced a quarrel with the accused, during which the deceased assaulted the accused, and struck him one or two severe blows on the head with a loaded cane, which felled him to the ground, inflicting a severe wound on his forehead. That the witness and others helped the accused up, and took him to water in a branch which was near, to wash off the blood; and the accused stepped into the water, and the witness pulled him back, and told him to stop and wash off the blood; and he asked how the blood came on him, and when told that deceased had struck him, he inquired what he had struck him for, as he had nothing against the deceased. And in order to show the relevancy of this testimony, other witnesses were offered, to prove that the deceased said on that day, that he expected he had killed the accused, and would have to leave the country; that if he had not, he would kill him. That he afterwards said that he had not killed the accused, but would do so if he ever crossed his path. It was admitted by the accused that these threats of the deceased were not communicated to him before the killing. This evidence was excluded, except that part of it which related to the assault and beating with the cane, and the conduct and conversation of the accused when taken to the water, and while the witness was washing off the blood; and this part of the testimony was allowed to go to the jury, in order to show the condition of the mind of the accused, and upon the point of his sanity.

It is insisted that the testimony thus rejected was competent to show the intent with which the killing was done, by presenting to the consideration of the jury the cruelty and ferocity of the conduct of the deceased in assaulting and beating the ac-

cused, showing the character of the deceased, and the just apprehension of the accused at the time of the killing, that he was then in danger of his life, or of great bodily harm from the deceased.   But this view is wholly untenable.   It does not appear from the evidence that the deceased made any hostile demonstration against the accused at the time of the killing, nor even that the threats, which he had previously made against the accused, were known to the accused.   The latter had no reason to believe that the feelings of hostility, which caused the deceased to assault and beat him on a previous occasion, still continued in his mind, much less that there was danger of a deadly assault upon him by the deceased at the time of the killing. The conduct of the deceased on the previous occasion was, therefore, not a sufficient ground to justify the accused in acting on the belief that his life was in danger, at the hands of the deceased, at the time of the killing.   It is well said by Chief Justice Ruffin : " The belief that a person designs to kill me will not prevent my killing him from being murder, unless he is making some attempt to execute his design, or, at least, is in an apparent situation to do so, and thereby induces me reasonably to think that he intends to do it immediately."   State v. Scott, 4 Iredell's Law, 415.   In this case the accused could not reasonably have acted on such a belief at the time ; for the deceased was unarmed, and does not appear to have been in possession of any instrument with which to make a deadly assault, and the accused was armed with a gun and pistol, and was so located towards the deceased that he could readily have used his arms in case of any hostile demonstration on the part of the deceased.

The effect of this evidence, had it gone to the jury, might have been, then, to operate in justification of the killing by the mere fact that the deceased had severely beaten the accused some six weeks or two months previously, which would have been clearly incompetent.   The testimony was, therefore, properly excluded.

The fourth error assigned is the action of the court in permitting the question to be propounded to the witness of the accused, Mrs. Newcomb, upon cross-examination, whether she did not say to the accused, at the wheat harvest of 1858, at the din-

ner-table at her house, and in the presence of J. Lambert, that
if the accused " did not kill John Frieze she would not own him
as her son." This question was propounded with the avowed
purpose of producing Lambert to testify that she had made
such statement, if she denied it. It was not objected to by the
witness, but by the accused, on the grounds—1st. Of irrelevan-
cy ; and, 2d. Of incompetency, as a foundation to impeach the
witness' credit ; and, 3d. Because it might tend to criminate
the witness. The court overruled the objection, and directed
the witness to answer, unless she claimed her privilege not to
answer it on the ground of its tending to criminate her. To
this ruling exception was taken, and the witness then answered
that she did not make the statement.

Upon the first ground of exception, it is insisted that it was
irrelevant to the issue on trial, whether the witness made the
statement alluded to or not. But the question was put for the
avowed purpose of introducing another witness to testify that
she had made the statement, if she denied it. The purpose was
to discredit her testimony, or to destroy or impair its weight be-
fore the jury. It was certainly material in determining the
issue on trial to ascertain whether the witness, on whose testi-
mony the defense of the accused mainly rested, was entitled to
credit, or was under such a state of feeling and bias in relation
to the matter involved in the trial, and which gave rise to it, as
to impair or destroy the weight to be given to her testimony.
Such an inquiry, therefore, is not irrelevant to the issue. If the
witness answer in the affirmative a question whether he has not
made statements or done acts in relation to the matter involved
in the issue, going to show a strong feeling or bias on his part,
touching the main fact, which gave rise to the trial, and in jus-
tification or condemnation of the party on trial, that fact would
certainly be proper to be weighed by the jury, in considering
the weight to be given to his testimony. But if the witness, on
examination, deny the statements about which he is questioned,
if it be plainly connected with the matter in issue, it appears to
be just that it should be proved by other witnesses that he has
made the statements or done the acts attributed to him, and
this for the double purpose of showing his bias and undue feel-

ing in the matter, and of contradicting and discrediting him. If the matter inquired of be disconnected with the fact involved in the issue, and collateral to it, it is well settled that the answer of the witness cannot be contradicted by other testimony, because that would lead to multiplicity of issues to be determined on the trial. But it is equally well settled, that it is competent to contradict the testimony of a witness who, upon his examination, has denied that he had used expressions or done acts in relation to the matter involved in the issue, showing that he is under a bias or undue feeling against the opposite party involved in the transaction which forms the subject-matter of the issue; as that he has expressed feelings of revenge towards him, or stated that he would give evidence against him.[1] 1 Stark. Ev., 190 (7th Amer. edit.); Rex v. Yervin, 2 Camp., 638; Att'y General v. Hitchcock, 1 Wels. Hurl. & Gordon, Exchequer Rep., 90; Atwood v. Welton, 2 Com. Rep. (N. S.), 66. Such an inquiry is important to show the state of mind and feelings of the witness towards the opposite party involved in the issue, and hence it is relevant to the issue, not as having a direct effect upon the issue, but in order that the jury may determine how far he is to be believed in his testimony as to the facts directly connected with the issue. Attorney General v. Hitchcock, and Atwood v. Welton. It is a general rule, that anything legitimately tending to show that a witness is under undue feeling or bias for or against a party to an issue in which he testifies, may be shown to the jury, to enable them to graduate the true weight of his testimony; and no just reason is perceived why this rule is not applicable to statements made, or acts done by him, in relation to the subject-matter of the issue. If he denies such statements or acts, and they are shown to be true as alleged, it appears manifestly to be proper, in the ascertainment of the truth of the issue, both that his bias and undue

[1] 1 Greenl. Ev., 450; see also Rex v. Yervin, 2 Campb., 638; Martin v. Farnham, 5 Foster, 195; Drew v. Wood, 6 ib., 363; Cooley v. Norton, 4 Cush., 93; Long v. Lamkin, 9 ib., 361; Newton v. Harris, 2 Selden, 345; Commonwealth v. Byron, 14 Gray, 41; Thomas v. Davis, 6 C. & P., 350; 2 Russ. on Crimes, 914; Edmunds v. Walter, 3 Stark. N. P. C., 7 (14 Eng. Com. Law R., 145); 2 Phill. Ev., 955, *et seq.*; see Roscoe Cr. Ev., 351; Roscoe Dig. N. P. Ev., 172, 173, 188, 189, 190; Edmunds v. Walter, 3 Stark., 7; Coles v. Coles, L. R., 1 P. & D., 70; Carpenter v. Wall, 11 Ad. & E., 803; Wharton Am. Cr. Law, 817; People v. Austin, 1 Parker C. C., 154; Gaines v. Commonwealth, 14 Wright, 327.

feeling should be proved, and that his credit should be impeached by proving the falsehood of his denial. And this is especially true where, as in this case, the witness bears a near relationship to the party for whom she testifies, and her testimony in his behalf is in conflict with that of other witnesses in the case.[1]

As to the propriety of first interrogating the witness whether he made the statements, thereby giving him an opportunity to meet the inquiry with a full knowledge of its object and extent, the rule appears to be well settled in favor of that practice, upon principles of justice to the witness who is proposed to be contradicted. 2 Phill. Ev. (Cowen and Hill's notes) 959, 4th Am. ed.; 1 Greenl. Ev., § 462.

This disposes of the first and second grounds of exception taken to the question.

The third ground of exception is that the question might tend to criminate the witness, by implicating her in the charge of killing the deceased.

If this objection had been made by the witness, it might have exempted her from answering the question. But this is the privilege of the witness, given him by the law, and secured to him by the constitution, for his own protection. It was the duty of the court to apprise him of his privilege—and that was done here—but not to prevent her from answering if she thought fit to answer, after being informed that she had the right to decline an answer.[2] 1 Greenl. Ev., § 451. And counsel will not be permitted to make the objection. Ib.

It is said that the refusal to answer, because of the tendency of the question to criminate the witness, would cast disparagement upon her, and have the same prejudicial effect upon her credit as if she admitted the charge involved in the question; and hence, that the question ought not to be permitted. But the courts are always careful to prevent this effect, by telling the jury that no such inference can be drawn from the witness' declining to answer. 2 Phill. Ev., 950, and cases there cited.

[1] See note, page 286, *supra*, cases cited.
[2] Thomas v. Newton, 1 M. & Malk., 48, note; Rex v. Adey, 1 M. & Rob., 94; Commonwealth v. Shaw, 4 Cushing, 594; Roscoe N. P. Ev., 181, 178.

The objection under consideration has sometimes been sanctioned in England; but the contrary rule, holding that the question may be asked, is well settled there, and is considered as established law in the courts of this country. 1 Greenl. Ev., § 451, and cases there cited; Southard v. Rexford, 6 Cow., 254; United States v. Craig, 4 Wash. C. C. R., 729; Torre v. Summers, 2 Nott & McCord, 267; Treat v. Browning, 4 Conn., 408.

This rule does not appear to be affected by the provisions of the constitutions of the United States and of this state, that no party shall be compelled to give evidence against himself in a criminal prosecution. For he is not "compelled" to testify, under the rule as above stated, but may always protect himself by claiming his privilege; and this is the rule held by the courts in this country, notwithstanding the immunity secured to such persons by the Constitution of the United States, and of the states in which this rule has been held.

We, therefore, think that this question, as put to the witness, was properly allowed by the court; and upon the same reasons, we think that the court acted correctly in admitting the testimony of the witness Lambert, to prove that Mrs. Newcomb had made the statement mentioned in the question put to her, and which she denied having made. And this disposes of the fourth and sixth assignments of error.

The fifth error assigned, relates to the exclusion of threats alleged to have been made by the deceased against the accused at some time before the killing, not specified, but which were not communicated to the accused. This ruling was clearly right, as is above shown upon the third assignment.

The seventh assignment is taken to alleged errors in the several instructions granted at the instance of the state.

We have carefully considered these instructions, and the objections which have been urged against them by the learned counsel of the plaintiff in error; but we are unable to perceive in them any error which would justify a reversal of the judgment. For the most part, they state rules of law which have repeatedly received the sanction of this court, so that they are

not now subjects for discussion. It is, therefore, needless to state reasons to show their correctness.

But it is proper to notice the objection taken to the eighth instruction. In the two instructions preceding that, the court instructed the jury, that mere weakness of mind would not excuse a party in the commission of a criminal act, if he had capacity and reason sufficient to enable him to distinguish between right and wrong in that act; and that the law presumes every person of the age of discretion to be of sufficient mental capacity; and to defeat that presumption, the mental imbecility of the party must be affirmatively established by positive or circumstantial evidence. The eighth instruction then states, that "it is not sufficient to show that such a state of mind was possible; nor is it sufficient if the proof merely showed it to have been probable."

The objection taken to this instruction is, that it is sufficient to warrant the acquittal of a party indicted for a criminal act, that the evidence renders it probable that he is innocent; and upon the same principle, when the evidence leaves it merely probable that a party is deficient in mental capacity, that he should be held as mentally incapable of committing a crime, and, therefore, be acquitted. But this is founded on a misapprehension of the rules of presumption, which are quite different in the two cases. In the former, the law presumes every man innocent until his guilt is established by proof; and hence, if the evidence renders it probable that he is innocent, it cannot be said that his guilt is proved, and therefore the presumption of innocence stands, and he must be acquitted. But in the latter, the presumption is that a man is of sane mind; and unless that presumption be removed by proof, it must likewise stand. Hence, if it be established by legal evidence, that he has committed an act criminal in law, the presumption of law being that he was of sane mind, that presumption is not overcome by the mere probability that he was insane, but will stand until overthrown by evidence; and, therefore, mere probability of insanity cannot prevail over the presumption of sanity, so as to work the acquittal of the party on the ground of insanity. Accordingly, it is laid down, that in order to

establish a defense on the ground of insanity, it must be clearly proved.[1]     2 Greenl. Ev., § 373.

The instruction, therefore, though somewhat objectionable in its phraseology, contains a correct rule of law, and is not obnoxious to the objection urged against it.

The eighth error assigned is, that the motion for a new trial was improperly overruled.

The first ground here taken is, that the verdict was not supported by the evidence. If the jury gave full credit to the two witnesses on the part of the state, who witnessed the killing, over the testimony of Mrs. Newcomb, the principal witness for the accused, it is clear that the evidence warrants the verdict. Several objections are urged against the credit and weight due to those witnesses, by reason of improbabilities, and certain discrepancies in minor things, stated by them. But these were matters proper to be considered and determined by the jury; and we cannot say that they erred in giving weight and credit to the testimony of those witnesses over that of the principal witness for the accused.

The second ground is the affidavits of one physician and of the jailor, in relation to the state of mind of the accused at the time of the trial, and tending to show that he was in a condition of mental imbecility at the trial, and immediately afterwards. These affidavits appear to have been made shortly after the verdict was rendered. They relate to a ground of defense which was set up on the trial, and are at least but cumulative evidence upon the question of sanity; and it does not appear that the evidence was discovered after the trial, or that it was not within the power of the party at the time of the trial. Upon well-settled rules, therefore, these affidavits were insufficient to support the motion for a new trial.[2]   But, in addition to this,

[1] Wharton's Am. Cr. Law, 55, 711; U. S. v. Lawrence, 4 Cranch C. C., 514; Attorney General v. Parnther, 3 Brown C. C., 441; Lee v. Lee, 4 McCord, 183; State v. Starke, Strobh., 479; People. v. Robinson, 1 Parker C. C., 495; Rex v. Layton, 4 Cox C. C., 149; U. S. v. McGlue, 1 Curtis, 1; Graham' v. Commonwealth, 16 B. Monroe, 587; State v. Spencer, 1 Zabriskie, 202; Lake v. People, 1 Parker C. C., 495: Bovard v. State, 30 Miss., *supra*, note; Kelly v. State, 3 S. & M., 518; State v. Marler, 2 Ala., 43.

[2] Wharton's Am. Cr. Law, 3179; State v. Blennerhassett, Walk., 7; Com. v. Flannagan, 8 Watts & Serg., 415; U. S. v. Gibert, 2 Sumner, 97; State v. Larrimore, 20 Mo., 425; White v. State, 17 Ark., 404; State v. Stumbo, 26 Mo., 306; Bixly v. State, 15 Ark., 375; Gardner v. Mitchell, 6 Pick., 114; Yarmouth v. Dennis, ib., 116; Sawyer

the facts stated in the affidavits, which are of course *ex parte*, appear to be in the highest degree improbable, and inconsistent with the condition in which the accused must have appeared, pending the trial. For if the condition of his mind had been, at the time of the trial, such as is stated in the affidavit of the jailor, it is unaccountable that no effort was made on the trial to prove it, and make it a special ground of defense.

The last error assigned is founded upon the special *venire facias*. But this cannot be noticed, because the *venire facias* is not properly a part of the record; and no objection upon the ground here stated was taken in the court below.

After a careful examination of the record, and due consideration of the able and ingenious argument of the counsel in behalf of the plaintiff in error, we are satisfied that there is no error in the record which would justify a reversal of the judgment; and it must be affirmed.

v. Merrill, 10 Pick., 16; Chambers v. Chambers, 2 A. K. Marshall, 348; Ames v. Howard, 1 Sumner, 482; Alsop v. Ins. Co., ib., 451; Bullock v. Beach, 3 Vermont, 72; Den v. Geiger, 4 Halst., 228; Pike v. Evans, 15 Johns., 210; Steinback v. Ins. Co., 2 Caines, 129; Smith v. Brush, 8 Johns., 84; Whiteback v. Whiteback, 9 Cow., 266; Reed v. Grew, 5 Ham., 375; Wheelwright v. Beers, 2 Hall, 391; Guyott v. Butts, 4 Wend., 579; People v. Superior Court of New York, 10 Wend., 285; Com. v. Williams, 2 Ashmead, 60; Moore v. Phila. Bank, 5 S. & R., —; Roberts v. State, 3 Kelly, 310; Com. v. Murray, 2 Ashmead, 41; Giles v. State, 6 Geo., 276; State v. Carr, 1 Foster, 166; State v. Larimore, 20 Mo., 425; 1 Gra. & Wat. on N. T., 486, *et seq.*; 2 Tidd., 938; 2 Arch., 224; Gra. Prac., 511; Smith v. Brush, 8 Johns., 84; Pike v. Evans, 15 Johns., 210; Hilliard on N. T., 380, § 13; Harnsbarger v. Kinney, 13 Gratt., 511; Bagge v. Lynch, 22 Mo., 563; Dossett v. Miller, 3 Sneed, 72; .Stimpson v. Wilson, 6 Ind., 474; Ferrin v. Protection Ins. Co., 11 Ohio, 147; Schlencker v. Risley, 3 Scam., 483; Smith v. Shultz, 1 Scam., 499; Brown v. Stacy, 5 Pike, 403; Wiggin v. Coffin, 3 Story, 1; Den v. Wintermute, 1 Green, 177; Jennings v. Loring, 5 Ind., 250; Jones v. White, 11 Humph., 268; Palmer v. Fiske, 2 Curt., 14; Ham v. Ham, 39 Me., 263; Gardner v. Gardner, 2 Gray, 434; Wrights v. Greenwood, 17 Geo., 418; Latham v. Selkirk, 11 Tex., 314; Castro v. Wurzbach, 13 Tex., 128; Wells v. Sanger, 21 Mo., 354; Live, &c., v. Oregon, &c., 7 Cal., 40; Coggin v. Jones, 29 Geo., 257; Milton v. Blackshear, 8 Florida, 161; Manix v. Mallory, 7 Clarke, 81; Stewart v. Hamilton, 19 Tex., 96, Handley v. Call, 30 Me., 9.