[No. 1858.]

### JOE FAVORS *v.* THE STATE.

1. PRACTICE — EVIDENCE.— It is a rule of practice that, after a witness has been cross-examined respecting a former statement made by him, the party who called him has a right to re-examine him to the same matter. The counsel has the right upon such re-examination to ask all questions which may be proper to draw forth an explanation of the sense and meaning of the expressions used by the witness on cross-examination, if they be in themselves doubtful. A defense witness, having impugned the reputation of the prosecutrix for chastity, testified on cross-examination that her reputation was about on an average with that of unmarried " darkies." The defense proposed, but was not permitted, to ask the witness on re-examination what

he meant by the "average reputation of unmarried darkies." *Held*, that, under the rule announced, the question was competent, and the trial court erred in suppressing it.

2. SAME.— The prosecuting witness having denied upon her cross-examination that she was instigated by third persons to institute the prosecution against the defendant, she was asked by the State, on re-examination, if the friends and relations of the defendant had not attempted to influence her not to testify against or prosecute the defendant. To this question the defense objected because it was not sought to inculpate the defendant directly in an attempt to suppress testimony. The trial court overruled the objection, and the witness testified that members of the defendant's family had attempted to persuade her not to testify against the defendant. *Held*, error, because, in the first instance, the defendant had the right to develop the motives of the prosecutrix, if he could, by cross-examination; and because, in the second place, the evidence adduced by the State on re-examination, inculpating only the relatives of the defendant, in the attempt to suppress testimony, the defendant was not bound thereby.

3. RAPE — CHARGE OF THE COURT.— FORCE, as applied to the crime of rape, was properly defined in the charge of the court as follows : "The definition of *force*, as applicable to assault and battery, applies also to the crime of rape, and it must have been such as might have reasonably been supposed sufficient to overcome resistance, taking into consideration the relative strength of the parties and all other circumstances of the case."

4. SAME.— The general rule obtains in this State that " the general reputation for chastity of the alleged injured female may be shown to be bad, not in justification of the offense, but as weakening the evidence of the prosecution as to the want of consent." See the opinion *in extenso* for a charge of the court upon the subject, *held* correct.

APPEAL from the District Court of Limestone. Tried below before the Hon. L. D. Bradley.

The conviction was for the rape of Eliza McGee in Limestone county, Texas, on the 23d day of May, 1885. The penalty assessed against the appellant was a term of five years in the penitentiary.

Eliza McGee was the first witness for the State. She testified that she lived with Mr. Dick Ward, on Honest Ridge, in Limestone county, Texas. The defendant, until May, 1885, lived in the same neighborhood, and near the said Ward's house. After supper one Saturday night, late in May, 1885, the witness left Mr. Ward's house to go to that of Charley Johnson, about a half-mile distant. The path between the two houses traversed a field. Witness met the defendant in that path at a point near where it left the growing corn and entered a cotton patch. The defendant said nothing, but caught witness, threw her down and despite her struggles and cries, pulled up her clothes, got on top of her, introduced his privates into hers, and went to work. Witness protested, begged and ordered him to quit, but defendant, who was physically greatly superior,

ordered her to "hush up," and persisted in having carnal knowledge of her. After he succeeded in carnally knowing her, defendant got up, told the witness to "go, G—d d—n her," and that he would kill witness if she reported the transaction. He accomplished his purpose by force and over the protest and resistance of the witness. The point of contact was between two corn rows, on the ground. The ground was very wet from recent rains, and the violent exercise of assault and resistance muddied the witness's clothing pretty much all over. While defendant had witness down, and was on top, Sam Favors, a brother to defendant, came along and remarked: "Ah! I have caught you!" Sam passed on, laughing. Within a few minutes defendant let witness up, and she continued on towards Charley Johnson's house, crying. She met Charley on the way, told him of the outrage upon her, and showed him the place in the corn row where it took place. Charley went with her back to Mr. Ward's, to whom witness complained of the outrage.

Cross-examined, the witness said that she had no appointment to meet the defendant at any place on that night for copulative or other purposes. She had not passed her promise to accommodate the defendant with horizontal refreshment on that or any other night. He had never before formed the carnal acquaintance of the witness. When she started to Charley Johnson's house, the witness left several parties, including her brother, Bob McGee, at her house, where a fiddle was being played for general amusement. She declined to wait for her brother, who said that he was going to Johnson's after a while. The defendant had not been in the habit of slipping to and dividing with witness the use of her bed at night. He said nothing when he assaulted her. The witness did, on the examining trial, swear that when he caught her he said: "I want some." Upon reflection the witness reiterates that statement. Witness had discussed the outrage upon her with several parties, but had never told Aline Thomas that she would not have reported defendant but for Charley Johnson. Johnson did not prevail upon her to report defendant. Witness had never, at the house of defendant's mother, had a scuffle with defendant over a snuff box. The witness passed one night at the house of Nerva, the defendant's mother, but did not on that night sit up with the defendant for a long time after everybody else in the house had retired. In answer to a question, the witness admitted that she told defendant's counsel that, when assaulted by the defendant, she told defendant that she "did not want to do it there, because they would be caught." Defendant winked at witness on the examining trial, when witness dropped her head and laughed.

Re-examined, the witness stated that the brother, sister and mother of the defendant had tried to prevail upon her not to testify against the defendant. The conversation between Mr. Kincaid, the defendant's counsel, as detailed by the witness, was conducted on his part in a peremptory, short manner. As a matter of fact, the witness did not, when assaulted by defendant, say to him that she did not want to engage in carnal exercise with him then and there because she was afraid of detection. The defendant had never detected witness and Sam Favors in carnal juxtaposition, standing up. Witness had never had carnal intercourse with Sam Favors, standing up. Witness did not say to defendant, after Sam Favors passed them, while defendant had her down: "You have been talking about catching Sam, and now he has caught you."

Sam Favors, the defendant's half-brother, testified, for the State, that he knew of the transaction which gave rise to this prosecution. On his way home through the field that night, the witness's attention was attracted by voices about one hundred and fifty yards in advance of him. His first impression was that two parties were laughing and talking. When he reached a point between fifty and one hundred yards of the parties, he heard a woman's voice calling "quit! quit!" Witness stopped a moment or two and listened to the woman's voice continuing to call "quit! quit!" He then walked on, and when he reached a point about thirty yards from the parties he saw them on the ground, and heard the voice of Eliza McGee say: "Quit, Jo., quit; somebody is coming." Witness then passed them at a very short distance, and as he did so remarked: "Aye-aye! I have caught you." Eliza thereupon remarked to defendant: "Now Jo., you have been talking about catching Sam, and he has caught you." After he had passed the parties witness heard somebody whistling. Witness testified that he first heard and recognized Eliza McGee's voice at a distance of about two hundred yards, but could not distinguish her words, and that when he had approached fifty yards nearer he distinguished the word "quit" spoken by Eliza. Subsequent measurement of distances enables witness to testify more particularly, and his present testimony is not affected by the fact that the disagreement which, at the time of the examining trial, existed between witness and defendant has been since removed. Witness had carnally known Eliza McGee, and was once, while copulating with her in a standing position, detected by the defendant.

Charley Johnson testified, for the State, that he lived on R. P. Ward's place. After supper on the night of the alleged rape, witness started from home to go to the house of Sam Favors. On his

way he heard Eliza McGee calling in distress.   She said, as witness understood her: "Do you take me for a fool? I am going to Groesbeeck and have you put in jail."   She was then at least two hundred and fifty yards distant from the witness.   Witness started towards her, and met her going towards his house.   She was weeping, and told him that defendant had overpowered and outraged her.   She then pointed out the place where she said the outrage had been perpetrated.   The ground was so torn up that it looked like the scene of a bull-fight.   Defendant's feet had dug deep into the ground, leaving plain tracks.   Witness advised her to go back and report the occurrence to Mr. Ward.   She replied that she was afraid defendant would kill her if she did so.   Witness then agreed to go with her, and did so.   Mr. Ward was informed of the transaction, and suggested that investigation be postponed . until next day.   The moon was shining on the night of the alleged rape.   Witness could see the point on the trail where it was said that the outrage was perpetrated, from quite a little distance.   It was about two hundred yards from where witness met Eliza, about four hundred yards from Ward's house, and about five hundred yards from Sam Favors's house, where the defendant lived.

Cross-examined, the witness said that he was a preacher, but Eliza McGee was not a member of his church.   He, witness, was a Baptist, while Eliza was a Methodist.   Witness had no ill feeling for the defendant, but, on the. contrary, loved him.   Before witness went to Mr. Ward about the alleged outrage, he went to Charley Bass, and then to Sam Favors.   A path from Sam Favors's house to that of his mother crossed the path on which the outrage was reputedly committed, not far from the point of commission.

R. P. Ward testified, for the State, that Eliza McGee had worked at witness's house for about eight years, for her food and clothing. She was a simple, silly-minded, childish negro.   Witness saw her on the morning after her alleged rape.   Her dress, behind, was muddy from head to foot.   Witness went to the place of the alleged rape, and found the ground, covering a space of three or four feet in diameter, greatly torn up.   A struggle had evidently taken place on the ground.   Witness went to defendant's house, called him out, and told him that he had placed himself in a troublesome position, and asked him why he did it.   He replied: "Eliza promised me some and I took it."   Eliza's reputation for chastity was bad.— "about on an average with that of other unmarried negro women." The State closed.

Will Terrell testified, for the defense, that the general reputa-

tion of Eliza McGee for chastity was very bad. That of Charley Johnson for truth and veracity was bad, and about an average for a negro. C. B. Ward, Joe Peebles and Jeff Johnson testified substantially as did Terrell, except that Ward and Johnson said nothing about Charley Johnson's reputation for truth and veracity.

Aline Thomas, defendant's half-sister, testified in his behalf that about two weeks after defendant's arrest, Eliza McGee told her that she had nothing to do with reporting the defendant for throwing her down in the corn field. Eliza's reputation for chastity was very bad.

Will Favors, defendant's brother, testified, for the defense, that Eliza McGee had passed many nights at his mother's house where the defendant lived. Witness saw defendant and Eliza one night, at defendant's mother's house, scuffling in play over a snuff box. Eliza's reputation for chastity was very bad.

The motion for new trial raised the questions discussed in the opinion.

*Kimbell & Harrell* and *Burrow & Kincaid*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

White, Presiding Judge. I. Defendant's witness Ward testified on examination in chief that the reputation of the prosecutrix for chastity was bad. On cross-examination the district attorney asked the witness if the reputation of the prosecutrix " was not about upon an average for unmarried darkies," and the witness answered that it was. On re-examination, defendant's counsel asked the witness what he meant by the expression " average reputation for unmarried darkies?" To which the prosecution objected because not in rebuttal of anything drawn out on cross-examination, and the court sustained the objection and refused to permit the witness to explain.

Mr. Greenleaf says: " After a witness has been cross-examined respecting a former statement made by him, the party who called him has a right to re-examine him to the same matter. The counsel has the right upon such re-examination to ask all questions which may be proper to draw forth an explanation of the sense and meaning of the expressions used by the witness on cross-examination, if they be in themselves doubtful." (1 Greenlf. Evid. (13th ed.), § 467; same doctrine, Whart.'s Crim. Evid. (8th ed.), § 493.) Under this rule appellant was entitled to ask and have an answer to his question on re-examination, and it was error to disallow it.

II. The prosecutrix, on cross-examination by defendant's counsel, was asked if certain parties had not been talking to and urging her to swear against the defendant, endeavoring thereby to show that she had been influenced by such other parties to institute and carry on the prosecution, and that but for their influence and instigation there would have been no prosecution. In answer to these questions the prosecutrix denied that she had thus been talked to, urged, instigated and influenced by said parties. On re-examination by the district attorney he asked the witness if the relatives and friends of the defendant had not been talking to her and trying to induce her not to testify against defendant. Defendant by counsel objected because irrelevant and because it was not proposed to show that defendant himself was in any way connected with such effort to suppress the testimony. This objection was overruled and the witness was permitted to testify that defendant's mother, sister and brother had talked to her in behalf of defendant, and tried to get her not to testify against defendant.

It was error to admit the evidence. Defendant had the right in the first instance to inquire, on cross-examination, into the motives inducing the witness to prosecute him. (Whart.'s Crim. Evid., §§ 477, 485; 37 Miss., 383; *Hart* v. *The State*, 15 Texas Ct. App., 202.) On the other hand, the prosecution might have shown, had such been the fact, that the defendant in person had bribed or attempted to bribe the witness, or that he had in person attempted to induce her not to testify against him. (1 Greenlf. Evid., § 461, and note.) But what his relatives did in the matter was not binding upon him, and could not be adduced as evidence against him.

III. It is strenuously urged that the court committed a grave error in the definition of "force" given in the first paragraph of the charge to the jury, in these words, viz.: "The definition of force as applicable to assault and battery applies also to the crime of rape, and it must have been such as might have reasonably been supposed sufficient to overcome resistance, taking into consideration the relative strength of the parties and all other circumstances of the case." This instruction is a literal, *verbatim* copy of the definition of "force" found in the chapter upon rape in the Penal Code, article 529. (*Jones* v. *The State*, 10 Texas Ct. App., 552; *Jenkins* v. *The State*, 1 Texas Ct. App., 346; *Anschicks* v. *The State*, 6 Texas Ct. App., 525; *Saddler* v. *The State*, 12 Texas Ct. App., 194; *Sharpe* v. *The State*, 15 Texas Ct. App., 171; *Bass* v. *The State*, 16 Texas Ct. App., 62.)

Objection is made to the fourth paragraph of the charge, which

is as follows: "Evidence of the character of the woman charged to have been raped, as to her chastity or the reverse, is admissible only for the purpose of being considered by the jury in arriving at a conclusion as to whether or not consent was given, and for no other purpose; the law being that a woman of bad character as to chastity is entitled to protection of her person as well and as much as one of good character in that respect."

The general rule in this State is that "the general character for chastity of the alleged injured female may be shown to be bad, not in justification of the offense, but as weakening the evidence of the prosecution as to want of consent." (*Lawson* v. *The State*, 17 Texas Ct. App., 292, in which many authorities are cited.) We cannot say that the instruction was erroneous under the law as it obtains in this State. Other errors complained of are not likely to arise upon another trial of the case.

For error in the rulings of the court with regard to the admissibility of the evidence, above discussed, the judgment is reversed and the cause remanded for another trial.

*Reversed and remanded.*