## William Caldwell v. The State.

### No. 6722.    Decided March 8.    Rehearing refused June 7.

1. **Practice—Evidence.**—On a trial for murder the State was permitted to introduce in evidence a piece of paper which was found pinned to the fence of the deceased at the point whence the fatal shot was fired, and on which there was certain writing in pencil.    The proved handwriting of the defendant was used as a standard of comparison whereon expert witnesses identified the handwriting on the piece of paper as that of the defendant.    It was further proved that the piece of paper was a leaf from a blank book found in the house of defendant, which book belonged to and was used by him to write in.    *Held,* that the paper and the writing thereon was properly admitted in evidence.

2. **Same—Surprise.**—The ruling of the court refusing to permit the defendant to reproduce the testimony of one Dr. M. as delivered on a former trial was not error, the other proof showing that the said witness was living, was a resident of this State, and had been attached as a witness in this cause.    If surprised by the testimony of the State's medical witness D., and he desired to contradict D. by the testimony of the absent witness M., the defendant should have applied for a continuance or postponement of the trial.

3. **Murder of the Second Degree—Charge of the Court.**—Murder of the second degree not being raised or even suggested by the evidence, the trial court properly refused to submit that degree to the jury.

4. **Alibi—Charge of the Court.**—On the issue of *alibi* the court charged the jury as follows:  "If the jury entertains a reasonable doubt as to the presence of the defendant at the place where the deceased was killed (if killed) at the time of such killing, the jury should acquit the defendant."    *Held,* correct and sufficient.

5. **Murder—Fact Case.**—See the statement of the case for evidence which, though circumstantial, is *held* sufficient to support a capital conviction for murder.

ON MOTION FOR REHEARING.

6. **Murder—Indictment.**—The charging part of the indictment was as follows: ✻ ✻ ✻ "that William Caldwell, ✻ ✻ ✻ on or about the 1st day of August, in the year of our Lord 1888, with force and arms, in the said county of Fort Bend, and State of Texas, did then and there unlawfully, and with express malice aforethought, kill one J. M. Shamblin, by shooting him with a gun." This indictment is objected to upon the grounds: 1. That it fails to charge that the accused *murdered* the deceased. 2. That it omits to charge the time and place of the shooting. 3. That it omits to charge the infliction of a mortal wound. 4. That it omits to charge the date of the wounding and the date of the death. 5. That it fails to charge that the shooting was done unlawfully and with malice aforethought. 6. That it is fatally defective for want of certainty. But *held*, that none of the objections are maintainable, and that the indictment is sufficient. See the opinion on the motion for rehearing for an elaborate discussion of the exceptions *seriatim*.

APPEAL from the Criminal District Court of Harris, on change of venue from Fort Bend. Tried below before Hon. C. L. Cleveland.

This conviction was in the first degree for the murder of J. M. Shamblin, in Fort Bend County, Texas, on the night of August 1, 1888. The death penalty was assessed by the jury.

W. D. Fields, the father-in-law of the deceased, was the first witness for the State. He testified, in substance, that he and the deceased lived in Fort Bend County, in houses situated between one and two miles apart. The shooting of deceased occurred early on the night of August 1, 1888, at which time the deceased was in the hallway of his house, the front door of the hallway being open. It was about 9 o'clock on that night that the witness heard of the shooting. He repaired at once to the deceased's house and found the deceased lying on the floor of the hall. He was then alive, and lived until 2 o'clock p. m. of the next day. Death was caused by buck shot wounds in the side and stomach.

The deceased's house was a building of four rooms with a twelve-foot hall in the centre. It faced north and the front hall door opened on a gallery. The said front door was about three feet wide. The house stood on blocks about eighteen inches above the ground. The yard fence— about four feet high and constructed of plank five or six inches wide, with spaces of four or five inches between them—bounded the house in front at a distance of about twenty steps from the gallery. The fence gate fronted the gallery. The ground for a distance of about sixty steps from the gate and fence in front was covered with matted Bermuda grass. Loose plowed ground intervened between that point and a gate entering a field, which field was wire fenced for a distance of about 600 yards in front of the house.

When witness reached deceased's house he found a table standing in the centre of the hallway, about twelve or fourteen feet back from the front door. A lighted lamp and a Bible were on that table. Witness found a

buck shot in the Bible, and saw where other buck shot had struck the table after passing through the doorway. The table was about three feet high, and was nearer the left wall, entering the door, than the right. The witness found some brown paper wadding on the gallery soon after he reached the house; and at about 10 o'clock on that night, while standing on the gallery, he observed a white object on the outside of the fence in front of the house, about five feet to the left of the front yard gate and about three feet above the ground. The witness, Dr. Mayfield, and others went to that white object and found it to be a piece of white paper tacked to the fence. The witness took that paper to the light in the house, and together with the other gentlemen examined it. It showed to be a leaf from a blank time book—having the days of the week printed inside of ruled lines on the top margin—and was about ten inches wide by fifteen inches long. It had one of H. H. Frost's bill heads pasted at the top, and under it were certain words which appear elsewhere in this report. The said writing was in lead pencil, and in a bold, plain hand. The paper now exhibited in evidence was the same identical paper. The witness took charge of and retained possession of that paper until he delivered it to the clerk of the Criminal District Court of Harris County. It had undergone no change since it was taken by the witness from the fence.

Immediately upon his arrival at the house of the deceased on the night of the assassination the witness sent to a neighboring convict camp and borrowed some bloodhounds. Immediately upon the arrival of the dogs they were taken to the place at the fence where the paper was found tacked. They at once took the trail, and followed down on the outside of the yard fence, across the patch of matted Bermuda grass and across the plowed ground to the big gate entering the field, and in the direction of the defendant's mother's house, where the defendant lived. After going 600 or 800 yards in that direction the dogs were called off, it being decided to postpone further investigation until morning. The convict guard who had charge of the dogs went back to his camp that night, promising to return with the dogs on the next morning, which, however, he failed to do.

After daylight on the next morning the witness went to the point across the plowed ground to which the dogs had trailed the previous night. There he found the tracks of two different persons, one being a large shoe track, and the other a barefooted track. He trailed those tracks to the large gate entering the field, where they went out, and at that point found the same two tracks where they entered the field and went in the direction of the deceased's house. He followed them to within sixty steps of the deceased's fence, where they struck the matted Bermuda grass and could be followed no farther. The barefooted track the witness identified at once as the track of Henry Caldwell, the brother of the defendant. It showed the distinguishing peculiarity of Henry Caldwell's foot, with which witness was familiar—an overlapping great toe of extraordi-

nary length on one foot.    The witness knew that track and its remarkable peculiarity so well that he could designate it among any number of tracks. The large shoe track corresponded in size and appearance with the shoes of defendant.    Defendant and his brother Henry lived with their mother in a house on the witness's place.

Soon after discovering the foot tracks the witness and sheriff Garvey, who meanwhile had arrived, rode to the house of the defendant's mother. Just before reaching the house they saw the defendant standing at a wagon in the yard on the opposite side of the house.    Garvey immediately started around the house, but when he reached the wagon the defendant had disappeared.    A woman who was with the defendant at the wagon when witness and Garvey first came in sight of the house, was then discovered down in a cotton patch, and Garvey sent the witness to see that woman.    She told witness that defendant had gone to a certain point.    Witness went to that point but failed to find defendant.    He then returned to defendant's house and found the defendant in the custody of Garvey.    A woman named Martha Hall and one of the sisters of the defendant were then in the house.    The witness then made a search of the defendant's house.    He found an Enfield rifle which would discharge buck shot, and which showed to have been discharged within the previous 12 or 18 hours.    He also found some buck shot similar to the one he found in the Bible at the house of the deceased, and a quantity of brown paper similar in every respect to the brown paper wadding he found on the deceased's gallery.    Garvey found in the defendant's house a red and white check-backed blank time book, which book the witness examined on reaching Richmond.    Comparison showed the paper found by witness on the deceased's fence to be a leaf from that book. The book still contained a part of the page cut from it.    The irregularities on the edge of that piece fitted the irregularities on the edge of the paper in evidence.    The ruled lines, the letters at the top, and the number of the page fitted and corresponded to a nicety.    The book now exhibited in evidence was the book referred to by witness.

Mr. H. H. Frost, whose bill head appears pasted on the paper in evidence, departed this life in Richmond, in August, 1889.    He was the proprietor of the "Red Hot" saloon in Richmond at the time deceased was assassinated.    He had a quantity of bill heads similar to the one in evidence scattered about his saloon within the reach of customers or visitors.    Defendant was a frequent visitor at that saloon.    A certain point on the road between the witness's house and Richmond was the scene of a recent Democratic barbecue, and nailed to a tree at that point, within view of travelers on the road, was a Democratic motto bearing the words, "Grandpa Harrison's pants won't fit Benny!"    The defendant could both read and write.    On the Tuesday preceding the assassination the witness met the defendant on the road near the said Democratic barbecue ground, on which

occasion the defendant told him he had been to Richmond to execute a bail bond under a charge of having fraudulently branded a colt.   At the time of the killing of deceased the defendant and his father were under indictment for the theft of a bale of cotton from the witness's gin.   Deceased, who traced and recovered the cotton, was the principal witness for the State against the defendant.   The witness was also a witness against defendant.   Likewise was one Ike Brown, who met a mysterious death in April, 1888, during the session of the District Court before which the cotton case against defendant was pending.   Defendant's father escaped arrest in the cotton case, and was still a fugitive from justice.

To have inflicted the fatal wounds on the deceased as described by the witness, a person would have to stand at the point about where the witness found the paper tacked on the fence.   The distance from that point at the fence to where the deceased was said to be seated at the table in the hall when shot was about twenty-five steps.   Previous to the discovery of the paper on the fence the witness was of opinion that some person from Richmond fired the fatal shot.   Deceased, who was conscious and clear headed, expressed the belief that the shot was fired by one of two negroes—Mose Richey and Jeff Kemp—acting together.   But after he discovered the paper and read the writing on it, the witness told deceased that he was doing Richey and Kemp an injustice by accusing them, as he, witness, was satisfied that the shot was fired by William Caldwell. Deceased was not popular with the negroes in the neighborhood, and had "had words" with many of them.   Martha Hall's reputation for truth and veracity was bad.   Sheriff Garvey died in August, 1889.   He was alive and testified on the former trial of this case.

Mrs. Shamblin, the widow of the deceased, testified for the State that the deceased was shot early on the night of Wednesday, August 1, 1888. He was in the hallway of his own house when shot.   At that time the witness was seated on a sofa in the hall.   A table stood in the hallway nearly on a line with the front door, but nearer the west than the east wall.   A lighted lamp and a Bible were on the table.   The witness's sister was seated at the table on the east side, and the defendant in a chair on the west side, his side and face quartering toward the front door, which was standing wide open.   The witness's baby was playing on the floor. Suddenly, without warning, somebody fired a gun through the front door from a point in the direction of the front yard fence, and the deceased fell forward, shot in the side and stomach.   The witness sent at once for W. D. Fields, her father, and Dr. Mayfield.   Deceased died about 2 o'clock p. m. on the next day.   Before his death, and while he was conscious and in his right mind, he said that he "was hopelessly shot," and that he believed Mose Richey and Jeff Kemp were the assassins.   Witness and her sister were in and about the front yard about sunset on the fatal evening

and witness knew that at that time no paper was adhering to the fence. It was placed there after sunset.

Captain R. E. Hanney testified for the State that he knew T. J. Garvey, sheriff of Fort Bend County, prior to his death. Garvey testified on the former trial of this case, and witness was present and heard his testimony. Garvey testified on that trial that he reached deceased's house early on the morning after the assassination; that he saw and read the paper found by Fields on the fence; that he and Fields then went to defendant's house; that before reaching the house he saw the defendant at a wagon in the yard on the opposite side of the house; that he rode around the house to the wagon, but found that defendant had gone, leaving his sister and Martha Hall at the wagon; that he told Martha Hall to go to defendant in the neighboring thicket and tell him that he, Garvey, only wanted to serve him with a subpœna as a witness, and to come back; that while Martha Hall was gone to the thicket he went into the house and found Cornelia Caldwell, the defendant's mother, in bed complaining of being sick; that he asked her for a piece of paper on which to write a note; that from a trunk under the bed Cornelia got a red and white check-backed blank book—the one in evidence; that he then asked her for some water, and that while she was gone into another room to get the water he secreted the book on his person, and afterwards took it to Richmond; that about the time Cornelia brought him the water he saw Martha Hall get a sack of clothes, whereupon he made her pilot him to defendant's place of concealment in the thicket, where he arrested him. The witness Hanney testified further that, as district attorney, he had tried as many as a hundred cases since the previous trial of defendant for this offense, and among them the case against defendant for the theft of a bale of cotton. On that trial he reproduced the testimony of the deceased before the examining court, and upon that testimony, and the testimony of Bill Eaton and others, he secured the conviction of the defendant for the theft of the cotton, with a two years term in the penitentiary assessed as punishment.

Harvey Ross testified for the State that he passed the house of the defendant about sundown on the fatal day. Stopping at the defendant's door for a minute, the witness observed the defendant sitting in his house writing. He had a blank book with a red and white checked back resting on his lap. The paper upon which he was writing appeared to be about as long and as wide as the book. It was resting on the book. When defendant observed the witness within three or four feet of him he quit writing, and placed his arm over the paper on which he had been writing. The book resembled the book in evidence. Martha Hall's reputation for truth and veracity was very bad. The witness and defendant had a quarrel some time before the killing of deceased.

Ella Brown testified for the State that previous to the killing of de-

ceased, the defendant, in conversations with her about the cotton theft case against him, told her that deceased was a witness against him in that case, but that the witnesses against him in that case would never appear. Witness did not know what he meant by that remark. He also said that he had "three pegs to drive into the ground," and that when he "got them driven the people would stop and wonder." On her cross-examination this witness said that she did not like the defendant—did not care whether he was hung or not, and that, so far as she was concerned, she was willing for defendant's case to be committed to Christ. Witness's husband was a stout, healthy man until he had a "falling out" with defendant, when he died suddenly and mysteriously. Witness had often seen defendant write notes to his sweetheart, at the store, some of which she carried and delivered for him. All of the notes he wrote in witness's presence he wrote on leaves torn from the book in evidence.

William Eaton, the father-in-law of the defendant, testified for the State that a short time before the killing of deceased the defendant told him that none of the witnesses against him in the cotton stealing case would appear in court. Witness was a witness against him in that case, but at the time of the conversation referred to had not been subpœnaed. About sunset on the evening of the fatal day the witness saw the defendant at his, defendant's, house, with an Enfield rifle in his hand. Witness knew Martha Hall, who lived at defendant's house at the time of the tragedy. He saw the said Martha leave the defendant's house about thirty minutes before sunset on the evening of the fatal day. She went in the direction of the house of Josephine Counsel. He next saw the said Martha between 8 and 9 o'clock on the next morning going towards defendant's house from the direction of Josephine Counsel's house. Witness's daughter, defendant's wife, was not living with defendant at the time deceased was killed.

Dr. John Dillard testified for the State that he reached the house of deceased about 11 o'clock on the night he was shot. Soon after reaching the house the witness read to the deceased the note found by Fields tacked on the fence. Deceased then told witness that he believed William Caldwell shot him.

W. L. Houston testified for the State that at the time of the killing of deceased, and for some time prior to that event, he was merchandising at Harlem Switch, in Fort Bend County, a short distance from the house of the defendant. During the time he had business relations with defendant he received many written orders bearing the signature of the defendant, several of which orders the defendant afterwards admitted that he wrote. Of these several orders the witness now produced six in court, all of which, since they were received by the witness, had been acknowledged by the defendant as written and signed by him. Moreover, the witness had seen the defendant write, was familiar with his handwriting, and could identify

it without his signature. Examining the writing found by Fields on the deceased's fence, the witness declared positively that it was the defendant's handwriting.

At this point the State introduced in evidence the paper found by Fields tacked on the deceased's fence. It reads as follows:

"Richmond, Texas.

"Fine Whiskeys,

"Wines and Cordials,

"Cigars, Plug and

"Smoking Tobacco.

  "Mr....................................

    "To H. H. FROST, Dr.

     "Proprietor of the Ret Hot Bar,

    "Dealer in General Merchandise, Buggies,

     "Cultivators, Plows, Acme Harrows,

      "Guns, Cartridges, etc."

"i am Just From town and Full of Hell in the neck for all dam misleaders.

    "July 18881.

    "July 29 1888.

"Mr. Shamblin—you have been Holding democrate meetting with the negros and you have said that Eny negro dont vote a democrate ticket on the Election day is sticking a knife in your chiles side the Republican partie have declared that no democrate shall be aloud to Hole Eny democrate meeting in Eny private place among the Eignent Race of the negroes, it is said that Grand papa harrison pants will not Fit benny but benny is going to wear them before the end of time the Republican parties is going to hold up their heads if they die Hard we will not have noe democratte to mislead the ignent Negro Race a stray you are a man to lead them astray & then cut their throats & suck their blud I am a Republican and have no use for a dam Democrat this is a lesson to all dam cut throat Democrats to Hold noe more meetings with the ignorent Negro Race of people."

E. Raphael testified for the State that he was a handwriting expert. Adopting the orders on Houston, and signed "Wm. Caldwell," in evidence as the standard of comparison, the witness declared that the chirography, grammar, spelling, capitalization, etc., shows conclusively that the entries in the book in evidence, the orders on Houston, and the document as above set out, which was said to have been found tacked on deceased's fence, were written by one and the same hand.

Josephine Counsel testified for the State that she lived on Mr. Fields's plantation in Fort Bend County. About an hour before sunset on the evening of the fatal day Martha Hall, traveling from the direction of defendant's house, stopped at the witness's house to get some snuff, and told the witness that she was going down into the bottom. About 8:30

o'clock on the next morning she again passed the witness's house travel-ing from the direction of the bottom towards the defendant's house. The witness was at the house of Cornelia Caldwell, the mother of the defendant, early on that morning, and told her that somebody had shot the deceased on the night before. Immediately she heard the defendant cough in the next room, and a moment later he left the house. About a week before the shooting of deceased Cornelia Caldwell remarked to the witness that defendant would have no trouble in the cotton case if the deceased was " only out of the way "—that the matter could be ad-justed with Mr. Fields. Martha Hall's reputation for truth and veracity was very bad. The State closed.

The defense relied upon was an *alibi*, and was supported by the testi-mony of the defendant, his mother, brother Henry, and Martha Hall, all of whom testified that they slept in the house of Cornelia Caldwell on the fatal night, and that defendant was not away from that house after dark. Martha Hall denied that she went into the bottom on the evening of the fatal day, passing the house of Josephine Counsel. Defendant denied that he wrote all of the entries in the book, any of the orders identified by Houston, or that he ever acknowledged to Houston he wrote them, or that he wrote the note in evidence which was claimed to have been found by Fields tacked on the fence of deceased. He declared that he did not shoot, and had nothing whatever to do with the shooting of the deceased. The several witnesses disagreed in their cross-examination as so what was served for supper in the Caldwell household on the fatal night. Some of them stated that the supper consisted of bread, butter, and coffee, but no meats; others that they had bacon and chicken and no coffee, and others that they had bread, coffee, and bacon, but no chicken. Explaining the condition of defendant's gun, the defendant and his brother testified that the defendant, at the request of his mother, who was sick, shot a chicken in the yard late on the evening of the fatal day.

*A. C. Allen* and *J. B. Stewart*, for appellant, on original hearing. *J. R.* and *E. Burns* filed a brief and argument in support of the motion for rehearing.

*W. L. Davidson*, Assistant Attorney-General, for the State.

Willson, Judge. — 1. We think no error was committed in any ruling of the court in admitting testimony objected to by the defendant. The paper found on the premises of the deceased was proved to be in defend-ant's handwiting by expert testimony. The orders used as standards of comparison were sufficiently established as writings made by the defend-ant. The book was found in defendant's house, and it was proved that

the same belonged to and was used by him to write in, and that the writing found on deceased's premises was upon a leaf taken from said book. Without discussing in detail the several assignments of error relating to the admission of evidence, we will merely say that, in our opinion, no illegal testimony was admitted against the defendant. That he was the author of the writing found on the premises of the deceased was, we think, legally and satisfactorily established. Code Crim. Proc., art. 754; Heacock v. The State, 13 Texas Ct. App., 97; Walker v. The State, 14 Texas Ct. App., 609; Haynie v. The State, 2 Texas Ct. App., 168; Long v. The State, 10 Texas Ct. App., 186; Speiden v. The State, 3 Texas Ct. App., 156.

2.   It was not error to refuse to permit the defendant to reproduce the testimony of Dr. Mayfield given on a former trial of the cause. Dr. Mayfield was living, was a resident of this State, and had been attached as a witness in the cause. If defendant was surprised by the testimony of Dr. Dillard, and desired to contradict it by the testimony of Dr. Mayfield, who was not in attendance upon the trial, he should have applied for a continuance or postponement of the cause. He certainly, under the circumstances shown, could not be allowed to reproduce the testimony of said witness.

3.   It is shown by the evidence most conclusively that the homicide was murder in the first degree. It was a deliberate assassination. The issue of murder in the second degree is not raised by the evidence, and the court properly declined to submit the law of murder in the second degree to the jury. Blocker v. The State, 27 Texas Ct. App., 16.

4.   We see no error in the charge upon the issue of *alibi*. It is sufficient and correct under numerous decisions of this court. Gallaher v. The State, *ante,* 247.

5.   Counsel for defendant have earnestly and ably insisted on this appeal that the evidence is insufficient to sustain the conviction. We are constrained to hold the evidence sufficient. While it is circumstantial, it is, to our minds, most cogent and convincing, and fills the measure of the law. It shows that defendant had a motive to kill the deceased. Deceased was a material witness for the State in a theft prosecution then pending against defendant. A short time before the murder the defendant stated that deceased would not appear as a witness in said prosecution.

At the place of the murder, and about where the murderer stood when he fired the fatal shot, a threatening writing was found tacked to the fence. This writing was not there a short time prior to the murder, but was found there on the same night of and after the murder. It was shown to be the handwriting of the defendant, and the paper was a leaf taken from a blank book owned by the defendant and found in his house on the next morning after the murder. Tracks of two persons were trailed from the place of the murder, and these tracks went in the direction of defendant's house. The tracks of one were identified as the tracks of

defendant's brother, who lived at defendant's house, and the other tracks corresponded with defendant's feet. At defendant's house a gun was found which had the appearance of having been recently discharged; also shot were found in said house similar to those found in the body of deceased; also paper was found in said house similar to wadding found at the place of the murder, which had been discharged from the gun used by the murderer in committing the crime. It was further proved by those who arrested the defendant that he attempted to evade arrest by concealing himself.

We have recited the main inculpatory facts, and we think they establish the guilt of the defendant beyond reasonable doubt, and to the exclusion of any reasonable hypothesis save that of his guilt.

The judgment is affirmed.

*Affirmed.*

Hurt, J., absent.

## ON MOTION FOR REHEARING.

HURT, JUDGE.—But one ground is urged for rehearing, viz., the sufficiency of the indictment. The indictment is in these words and figures:

"In the name and by the authority of the State of Texas: The grand jurors, good and lawful men of the State of Texas, county of Fort Bend, duly tried on oath by the judge of the District Court of said county touching their legal qualifications, impaneled, sworn, and charged to inquire into and true presentment make of all offenses against the penal laws of said State committed within the body of the county aforesaid, upon their oaths present, in the District Court of said county, that William Caldwell, late of the county of Fort Bend, laborer, on or about the first day of August, in the year of our Lord one thousand eight hundred and eighty-eight, with force and arms, in the said county of Fort Bend and State of Texas, did then and there unlawfully, and with express malice aforethought, kill one J. M. Shamblin, by shooting him with a gun, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State."

The first objection to the indictment by counsel for the motion is that it fails to charge that the accused *murdered* the deceased.

Mr. Bishop says: "It is familiar doctrine that, with such exceptions as foreign laws, private statutes, and municipal by-laws, the courts take cognizance of the law they administer; which, therefore, need not be specially brought to their attention, and need not be proved. On the other hand, there is no judicial knowledge of facts, and they must be alleged and established in evidence. Hence, it is one of the first principles of pleading that you have only occasion to state facts; which must be done for the

purpose of informing the court, whose duty it is to declare the law arising upon these facts, and to afford the opposite party of what is meant to be proved, in order to give him an opportunity to answer or traverse it."

"The indictment must allege the primary facts. For example, if it charges simply that the defendant committed larceny, it discloses only a secondary fact, produced by a combination of primary facts and law; or, in other words, it is a conclusion of the law upon the facts. And this is not a fit statement upon which to put the accused person on his trial. The pleader should set out the primary facts, disconnected from the law; and then the court applying the law to them, will declare the legal result." 1 Bish. Crim. Proc., 329, 331.

The rule above stated is unquestionably correct, and is applied at common law to all indictments except for murder, perjury, and rape. At common law the indictment in murder must allege that the accused did murder the deceased, and in rape that the accused did ravish the prosecutrix. Murder and rape, as are all other offenses in this State, are statutory. Mr. Bishop says that, being a statutory offense, "the indictment must, as in other cases, substantially contain the essential terms of the statute."

Ravish was indispensable in the common law indictment for rape, because it is in the statute of Westminster, 2, "If a man from henceforth do ravish a woman." In Davis v. The State, 42 Texas, 226, the Supreme Court held that the indictment was sufficient without the word ravish or rape. This ruling was based upon the ground that rape was a statutory offense, and that the indictment followed the language of the statute. Rape is defined by our code to be "the carnal knowledge of a woman without her consent, obtained by force, threats, or fraud."

Any person with a sound memory and discretion who shall unlawfully kill any reasonable creature in being in this State shall be deemed guilty of murder. Hence, murder is the unlawful killing of a reasonable creature in being with malice aforethought.

We are not treating of the condition of the slayer's mind.

Now, then, if the word rape can be omitted from the indictment in a prosecution for that offense, why can not the word murder be omitted in the indictment for that offense? How is it that indictments for robbery, arson, burglary, theft (or larceny at common law), are sufficient when those offenses are not by name mentioned in the indictment? At common law there was an allegation in perjury that the accused "did in manner and form aforesaid commit wilful and corrupt perjury." What says Mr. Bishop on this subject? "But, unless the indictment is, as in murder, drawn on a statute the terms of which are not sufficiently covered by the preceding allegations, such a closing averment can not be necessary, for it is a mere conclusion of law. * * * Indictments should set out facts, not law." 2 Bish. Crim. Proc., sec. 903.

To the writer this proposition is perfectly sound.  But let us concede that the terms of the statute are not sufficiently covered by the preceding allegations.  How does a conclusion of law aid such an indictment?  This by the way.

A rule which is overwhelmingly supported by authority as well as reason, is that the facts constituting the offense must be alleged.

The second objection is that the indictment "omits to charge the time and place of the alleged shooting."

The indictment charges that the appellant, in said county of Fort Bend, on the 1st day of August, A. D. 1888, did then and there kill Shamblin by shooting him with a gun.  Now, the appellant could not kill the deceased by shooting him with a gun on said date and at said place without shooting him at that time and at that place.  For if he killed the deceased by shooting him with a gun, the shooting must have occurred at that time, and this is alleged.

The third objection urged to the indictment is that it omits to charge the infliction of a mortal wound.

It charges that the appellant killed him by shooting him.  This he could not have done without inflicting upon the deceased a mortal wound.

The fourth objection urged is that the indictment omits to charge the date of the wounding and that of the death.  If appellant killed deceased on a certain day by shooting him, he must have wounded him before he died, and deceased must have died on that day.

These objections to the indictment present this question:  Does this indictment inform the accused in plain language that he, on a day named, in Fort Bend County, with a loaded gun, shot, wounded, and thereby killed the deceased?  It evidently does in the most simple and effective method.  No man can read this indictment and have any doubt as to the time and place of the shooting, as to the wound, or the date of the same, or the time of the death of deceased.  The information relating to these facts given to the accused by this indictment is as full as that contained in a common law form for this offense.  The plain, simple truth is that the common law forms are calculated, in a great many cases, to confuse the accused.  It is altogether useless to tell the accused that his gun was loaded with gun powder and leaden balls; that he presented his gun at, to, or against the deceased; that he discharged said gun, and that the leaden balls struck and wounded the deceased; that the wound was mortal, and deceased died from said wounds.

When told that he killed deceased by shooting him with a gun, the accused, unless insane, knows that his gun was loaded; that he discharged it at deceased; that he struck him with the ball or balls; that the wound inflicted was mortal, and that from it the deceased died.  Under such information as is given by this indictment no man of common intelligence would fail to comprehend these facts.

The fifth objection is that the indictment fails to charge that the shooting was done *unlawfully* and with *malice aforethought.* Another objection is that it is fatally defective for want of certainty. These will be noticed together.

Treating of this offense, Archbold says: "It is of little matter by what means the death was effected—whether by poisoning or shooting, stabbing, cutting, or wounding—whether with a deadly weapon, or with a stick or first; or by drowning, suffocating, or strangling, or the like." If the killing was unlawful and with malice aforethought, the death being effected by shooting, such a killing could not be unlawful and with malice and the shooting be lawful and without malice. The allegation that the accused did unlawfully and with his malice aforethought kill the deceased by shooting him with a gun necessarily charges that the shooting was unlawful and with malice. It is true that to shoot a man is not *per se* unlawful, nor is the killing of a man. These may be correct propositions, but it does not follow that this court is presuming that a shooting with a gun is a killing. We are not left to presumption regarding this matter, because this indictment charges that the appellant did unlawfully and with malice aforethought kill the deceased. How? By shooting him.

Now, it is not alleged that appellant murdered the deceased by shooting him, *but that he killed him*—the killing being one of the necessary primary facts, and not a conclusion from any other fact.

But it is objected that the indictment is not certain as to this fact—the killing; that there is no direct, positive, and certain averment that the defendant did kill deceased; that this averment is made indirectly by alleging that defendant killed the deceased "by shooting him with a gun," and that this method of charging a fact is not good pleading. We are referred for authority in support of this proposition to The Republic v. Bush, 1 Texas, 455, and The State v. Higgins, 53 Vt., 191.

In the Bush case the statute provided that any person who shall keep a tavern, ordinary tippling house, or other description of establishment for entertainment, or for the sale of spirituous liquors by retail, and shall sell or otherwise dispose of wine, rum, brandy, whisky, cordials, or any other description of spirituous liquors in smaller quantities than one quart, without license, etc.

The indictment alleged that on a day named the defendant kept a tippling house by retailing spirituous liquors in quantities less than one quart without first having obtained a license therefor. Now, by reference to the opinion of Justice Wheeler it will be seen that the indictment failed to charge, directly or indirectly, the elements of the offense. This is evident from a comparison of the statute and indictment; and hence the Bush case is not in point.

In the Higgins case we have the correct rule. In the opinion it is

said: "The charge in substance is that the respondent aided, etc., by doing certain things. As the aiding another to sell liquor is not *necessarily unlawful*, the pleader recognized the necessity of stating the manner of aiding. The averment was material. It must therefore be stated positively and directly, and in a way that can be traversed. An averment that a person did one thing by doing another thing is not a direct and positive averment that he did the *latter thing*. The conclusion that he did it is reached only by inference and argument, which is not sufficient in a criminal complaint. The use of the participial form of averment is sometimes sufficient."

Bishop, in his work on Criminal Procedure, volume 1, section 556, says: "Where the direct averment is required, as in laying the main charge, it is usually made with the verb. But any other part of speech which reasonably conveys the idea is adequate; as a participle or even an adverb. Approved precedents are numerous where this form is adopted; mainly in indictments for assault, breach of the peace, resisting an officer, disturbing religious meetings, and adultery. But in each instance it will be noticed that the charge is direct: first, that the accused committed that which was an offense in itself, without aid of further averments as to the manner of doing it; not that which only becomes an offense by reason of the circumstances under which it was done. Williams, C. J., in State v. Day, 3 Vermont, 142, says: 'Every indictment must state all the facts and circumstances which constitute the offense; and when the act complained of becomes a crime only from its peculiar relations or circumstances, and without them would not be unlawful, then those circumstances or relations should be set forth in the indictment.' There are numerous authorities to the effect that if the averment is descriptive of a person, as being of a certain age or as holding a certain office, or relation, as being a sheriff, husband, or wife, or is descriptive of intent, or is a statement of knowledge, and this can be expressed so as reasonably to convey the idea, in a qualifying clause in a sentence containing the main charge, it may be done by use of the participle."

Where lies the distinction? Evidently here: If the acts which constitute the offense are charged directly, the manner of doing it or the means used to accomplish it may be alleged in the participial form. 1 Bish. Crim. Proc., secs. 556–58.

What, therefore, are the acts which make up the offense of murder? Omitting the capacity of the accused, murder is the unlawful killing of a person with malice aforethought. This indictment alleges that the appellant did unlawfully and with express malice aforethought kill J. M. Shamblin. If this be true, appellant is guilty of murder, for it is, in law, impossible for one person to unlawfully and with his malice aforethought kill another person and not be guilty of murder.

This indictment charges positively the commission of that which is in

itself a crime.  It charges all of the acts entering into the make up of murder—not by alleging the doing of something else, but directly and positively.  If all of the elements of murder were not *directly* alleged we would hold that no fact necessary to constitute the offense could be indirectly charged so as to cure the defect in the direct allegations.  We ·call special attention to the Higgins case.  It will be found an admirable exposition of these rules.

We have answered all the objections urged to the sufficiency of this indictment.

We desire to call attention to the following authorities holding such ·indictments constitutional:  Newcomb v. The State, 37 Miss., 383; Noles v. The State, 24 Ala., 672; Wolf v. The State, 19 Ohio St., 248; Aiken ·v. The State, 35 Ala., 399; and specially to Rowan v. The State, 30 ·Wis., 129.

In this case the statute provides that in indictments or informations for murder or manslaughter it shall not be necessary to set forth the manner in which or the means by which the death of deceased was caused, but :it shall be sufficient in any indictment for murder to charge that the ac-·cused did wilfully, feloniously, and of his malice aforethought kill and :murder the deceased.  All the constitutional objections made in the case before us were urged in the Rowan case.  They were decided against Rowan upon the ground, mainly, that the indictment contained all of ·the essential elements of the crime.  This being the case, it was held that the other matters and things contained in a common law indictment were ·formal, and hence within the power of the Legislature to change.

Now, we have held that the Legislature of this State has no authority ·to prescribe a form of indictment, and make the same sufficient, which fails to contain all of the elements of the crime.  But we have never held that the Legislature could not prescribe a form for indictment which would not be good if the facts constituting the crime sought to be charged are ·contained in the form.

If the offense is sufficiently particularized as to come within the rule of pleading, we would hold that such form would not be obnoxious to con-.stitutional objections, either Federal or State.

The motion for rehearing is overruled.

*Rehearing refused.*

Judges all present and concurring.

₀   [The transcript in this case pertains to and is filed at the Galveston branch of this court, but the motion for rehearing having been disposed ·of at the Austin Term, the case is reported as of that term.—REPORTER.]